I am advised by the clerk that all counsel and people arguing otherwise if not counsel are present and therefore will turn to the calendar and begin with argument in a bail motion. United States v. Boustany. Good morning, Your Honors. May it please the Court. If a court determines that a defendant poses a risk of flight. Can I start out by asking you what the standard of review is or is that what you're about to tell me? Your Honor, I can tell you that the standard of review we believe that's relevant today is essentially de novo review. The court reviews factual findings for clear error, but the court reviews in a bail determination like this where there are mixed questions of fact and law and ultimately as we assert here a misapplication of the law, there's a plenary review. That would be to the legal error, but why don't you start your argument and let's see how that evolves. Absolutely, Your Honor. As I was saying, if a court determines that a defendant poses a risk of flight, the Bail Reform Act poses only one question and that is are there any conditions that can be set that would reasonably assure a defendant's presence in court? Here the district court erred below because it failed to hold the government to its burden and it never arrived at any coherent explanation of why the conditions that were suggested by the defendant in this case would be insufficient to reasonably assure the defendant's presence. Now the private security solution that the defendant proposed in this case has been utilized numerous times by courts in this circuit. It has been discussed and utilized in decisions including the Sabani decision that Your Honor authored. People who had roots in the community and that was a circumstance where the government agreed to that even before it was proposed. So it seems to me the case is quite distinguishable. You don't have either of those circumstances here. Your Honor, I think that the case is not distinguishable in the most important ways, which is the government did ultimately agree to the use of the condition, but it had opposed it in the district court and when the government came before Your Honor at oral argument, the court pressed the government to do exactly what the district court did not do in this case, which is explain exactly why the conditions that have been proposed by the defendant, including strict pretrial supervision with electronic monitoring, private security, and the other conditions that we've suggested including the surrender of all travel documents would be insufficient. I remember the argument quite vividly. I'm not sure we ever discussed whether home monitoring was sufficient in light of the government's concession that it was. That's quite different from this case, isn't it? Your Honor, I... There were concerns in the communities. The Pawnees had... They had means and wherewithal to flee. There were concerns there, but they did have roots in the community. Your client has none. Well, Your Honor, we believe that that can go appropriately to the question of risk of flight and if the court... Well, that's the issue. And... Well, that's one of the issues. I agree, Judge Radji, but once you get past risk of flight, the question that really is at the center of our appeal is, are there any conditions for a man presumed innocent, a man presumed innocent in this case... When you say get past the risk of flight, what do you mean? Isn't the concern is, are these conditions sufficient to assuage the risk of flight? Isn't that what we're really talking about here? I don't... Your Honor, Judge Radji, I would respectfully say that it's slightly different from that. I think that the first question is, has the government met its burden of demonstrating that the defendant is at risk of flight? And you don't think they've met that burden? We don't need to argue that for today. We don't think that they have. For the purposes of today, you accept that he's at risk of flight? For the purposes today, we'd ask the court to focus more on the second prompt. We don't think he's at risk of flight, but we ask the court to focus on the second prompt. And once you get there, the only question is, are there any conditions, any conditions that can be set that would reasonably assure the defendant's presence? And what the court said in Somnani is that the conditions that Your Honor described as extraordinary would guarantee the defendant's presence, would reasonably assure the defendant's presence. And that's a situation where the defendants had substantial overseas ties, substantial wealth. And in that case, they were accused of a violent crime. Mr. Bustani, on the other hand, is accused of no violence. His family is here, his wife has traveled here to support him during the time of the trial. And what the government's attempting to do is ask him to be detained for perhaps a period of years. We don't even have a trial date separated from his wife and his five-year-old son for a man presumed innocent, while there has not been a determination yet of his guilt. And what the Bail Reform Act, we submit, provides is, if there are any conditions that can be set that would reasonably assure his presence, bail should be set. Let me review these conditions. If you want to propose a different set of conditions to the judge, you're always free to do that. So the question is whether the judge abused his discretion in not releasing him on these conditions, isn't it? I respectfully disagree, Your Honor. I think it's slightly different. The question is, did the court, did the district court, fulfill its duty to hold the government to its burden by determining whether there were any conditions that could be set? And what the district court did in this case is it said, okay, your proposal is insufficient. The $1 million is insufficient, and I have questions about the potential conflicts of interest of this security firm. That's not enough under the Bail Reform Act. Let me ask, did you go back and propose a greater amount? I mean, Judge Kuntz's decision is dated February 4th, and a month has passed in that time, and I'll ask the government as well, but it struck me that some of his concerns that were expressed in his written opinion might have been allayed had you gone back and proposed a greater bond and identified the source of the bond money and offered to voluntarily waive extradition and other factors that he considered. Did you go back to the district judge on that? Your Honor, we didn't go immediately back to the district judge. What we did was, in the district court, we suggested to the judge that we were willing to accept extraordinary conditions, and we were prepared to accept additional conditions, but what the judge did was he made his decision before we had an opportunity to discuss any additional conditions that the court would find appropriate. I was asked to be put on the judge's calendar and say, we have a new bail package to consider, to propose. That happens all the time. You know that. Absolutely, Your Honor. You're absolutely correct. However, it was the burden of the government, we would suggest, in this case, to identify the additional conditions that would be necessary, and the district court, if it felt that additional conditions were necessary to assure the defendant's presence, should have identified those conditions without making a determination. That was the opportunity to engage with the parties. I'm not sure I'm following that, because a district court might very well say, you know, two million dollar bond would satisfy me, if it's the defendant's money. That's a different question from whether it's his mother-in-law's money, his business's money, and all that. You're asking the district judge to engage in hypotheticals about what would or wouldn't be accepted. I mean, usually how I've seen this is the parties come to the judge with a package, and the government says it doesn't think that that's satisfactory for whatever reason, and the defense argues why it would be sufficient, and the judge rules on that package. You're not foreclosed from coming forward with another one, or even from inviting a suggestion as to what particular concerns the judge has. But I don't see how we're supposed to conclude here that there is . . . I mean, are we supposed to say there's some package out there that would be sufficient for your client? There may well be, but the district judge hasn't said no way, no how yet. Mr. Jackson, I just wanted to say, take your time in answering. Thank you very much, Judge Connery. Judge Radji, I think you ask important questions there, but I think that our experience in the district court has been in many, many bail arguments, has been that when the court is appropriately discharging its responsibilities under the Bail Reform Act, when it finds that the conditions are not sufficient that have been proposed by the defense, what the court says is, I don't think that's enough money. I'm going to suggest that you increase the amount by another million dollars, that you go with a different security firm, and that in addition to what you suggested, which would be regular pretrial supervision, we bump it up to strict pretrial supervision with electronic monitoring. Now here, we already had conditions proposed that this court described as extraordinary in the Snobbani case, and I would note that private security has literally never failed in this circuit, in the many times it's been utilized, including the many times where the government has consented to its use. The district court didn't do that. The district court, it wasn't for us to go back to the district court after the court had made its ruling, and continue with the process of keeping on asking, well, let's raise the stakes, let's move to reconsider and raise them again, until we reach a point where the district court gives us an order that says that we've met the conditions that it thinks are sufficient. Am I right that this bail package has your client putting up nothing? That the assets are all being put up by his company? No, Your Honor. What is he putting up? He is putting up, he proposed putting up $1 million in his own money in this bond. It's a bond, right? That's correct, Your Honor. But he's not posting a million dollars with the court. No, no, no. We proposed a $20 million personal recognizance bond where we would put up $1 million in cash. What we said in our brief in this court is that we would be willing to put up any amount of money that is within the defendant's possession that the government suggested. There are literally no conditions that the government could suggest that have been utilized in any other case that we would not be willing to put up. Did the judge suggest anything that might be satisfactory, or was the judge relatively clear that nothing would be satisfactory? Nothing, Your Honor. That's exactly what I just said. Did he say that, or how did he say that? He said that there would be no conditions that would guarantee the defendant's appearance and gave us no opportunity, didn't suggest to us anything that would fix it. Did he essentially cut it off, or whether he said this is not enough? He cut it off, Your Honor. He cut it off. He said that in light of the government's allegations and the nature of the defendant, no conditions would be sufficient. What he said was having carefully evaluated defendant's bail proposal under the circumstances of the case, the court is convinced no conditions can reasonably assure the defendant's appearance throughout the pendency of this case. That could be construed to mean that he has to make the no conditions finding. The conditions that have been proposed to him, if those are the conditions, they don't assure the defendant's appearance. I mean, this seems to me to be how judges deal with bail proposals all the time. Judge Rodger, again, I would just respectfully slightly disagree with that, because I think that what that does is it improperly shifts the burden to the defense to try to come up with the appropriate bail package that will satisfy the court. Could you describe, please, the operation of the retention of a private company to provide surveillance and monitoring? The judge identified a conflict of interest concern that your client would be the employer and therefore would have the loyalty of the individuals, but I assume pretrial services is heavily involved and actually that your client wouldn't be paying the company directly. Maybe could you describe the circumstances that should allay that concern? Absolutely, Your Honor. And this is, I think Judge Carney, that's exactly the question here. This is a situation that has been utilized in numerous cases and never failed. The company that would be utilized, Guidepost Security, that we proposed, and we suggested to the government, we'd be willing to use any company that the government wanted, and we put that in our papers before the judge, but Guidepost is run by former federal, high-ranking federal law enforcement officers. Bart Schwartz? Bart Schwartz is from, exactly, Your Honor, who is one of the most respected people in law enforcement. He's the monitor for GM, he's the monitor for the recent NYCHA situation. The government itself has utilized him, and what they would be doing is posting all former law enforcement officials, including federal former law enforcement officials, to monitor Mr. Boustany 24 hours a day, and they would be answerable to the court. They would coordinate with pretrial services and answer any concerns pretrial services had. Now, the money that would be utilized to pay Guidepost would come either from our defendant or our defendant's company, which is indemnifying him in this case, but as Mr. O'Connell, the president of Guidepost, put in his sworn affidavit before the district court, they would in no way be employed by the defendant, they would in no way answer to the defendant, and indeed, the entire reputation of Guidepost, which is excellent in this industry, is dependent on the idea that the courts can trust them because they are dedicated to their mission of serving exactly the purpose that we're talking about in this case.  Yes, Your Honor. Your red light is on. What is it that your colleague wants to see? My colleague, Your Honor, I think wanted to . . . Oh, half a second. I'm going back to Judge . . . I'm not sure. He expressed . . . he quotes the government's memorandum for this, but he says that the defense had thus far not indicated the source of the $1 million in cash being posted. I think that's where I got the impression that it wasn't your client's money. In any event, what was told to the judge about the source of the money? Your Honor, we told the judge that Mr. Boustany would post the $1 million and that the private security would likely be paid for by his company, which he's identifying as. Right, but his concern, if I read this correctly, is whether the monies were traceable to the defendant. I'm not saying that that's this court's finding, but I think that's the reasoning of the judge. And Your Honor, we think that if that's the reasoning of the judge, that's a fair reasoning. The money would be in the possession of the court, so I think it would be available for all appropriate purposes, but that's exactly what Your Honor identified, Judge Radji, in the Somnani case as something that could be a concern, that a defendant might value his Your Honor noted in Somnani that the extraordinary conditions that were put in place in that case mitigated that concern because they eliminated the realistic possibility that the defendant could flee. And in this case, there was never any articulation of how Mr. Boustany, who is not alleged to be a violent person, unlike some of the other defendants who have been released pursuant to these kinds of conditions, like the defendant in Esposito, he's not alleged to be connected to any violent organization. There's no danger to the community. I think you're not addressing the primary concerns of the district judge. A million dollars, with the source unknown, it could be traceable to the fraudulent scheme, for a person who has tens of millions of dollars is something he might be willing to lose rather than his liberty. And then when his security firm is paid by his company, which faces some criminal exposure here, and so it's paid for by a possible target of the investigation, that raises concerns. And then there are the added concerns that, you know, how these private companies enforce the bail bond or the bail conditions is a further concern. Your client can sign all the waivers he wants. There might still be concerns about what they can do as compared to law enforcement officers. Now, if you're arguing to us, those are wrong assumptions and this bail bond is sufficient, I'd like to hear that argument. If your argument is there's another bail bond that would assuage these concerns and we're prepared to meet it, then my question is, why don't you just go to the district court if he rejects that? We'll hear you. Well, Your Honor, argument is both.  Why should we find that it's wrong for a district court to conclude that a million dollars from someone who's got tens of millions of dollars, particularly where it's unclear what the source of the money is, is not an acceptable way to assuage the risk of flight? Why should we find that error? Because Your Honor, for the exact reason that Your Honor identified in Subnani's case, that goes to the risk of flight. It does not go to whether the conditions proposed would be adequate. I'm sorry, but you're totally confusing me. The whole point of the conditions is to assuage the risk of flight. If they don't do that, then there's no conditions that assure his appearance. And Your Honor, it's up to the district court to identify how the additional money would lead to his release. And I would just note, Judge Radley, with regard to guideposts, the particular company that we've identified in this situation, there is no explanation anywhere that suggests that this is a situation where the defendant would be able to evade the conditions that are employed here. And the concerns that are identified would literally apply to any situation where you're utilizing private security, the theoretical conflict of interest. It can't be the case that the district court is saying, at large, this can never be utilized because it's explicitly authorized in the Bail Reform Act. The very first condition that the Bail Reform Act suggests that the district court should consider is the release of a defendant to an authorized third-party designee who would be responsible for securing the person and returning them to the court. Thank you very much. I think we have the arguments now. I appreciate the court's time. And you have reserved a minute of rebuttal. We'll hear from the government. Thank you very much, Your Honors.  Mark Beeney. And you should take your time, sir. Sure. Thank you. Mark Beeney for the United States. And I represented the United States in the district court. Your Honors asked about the Subnani case, and I just wanted to point out that in addition to the points that Judge Raggi made regarding why that case has no application here, I would note that that case, in addition to involving naturalized—in addition, I should say, involved naturalized U.S. citizens who had been here for 25 years. How long until trial of the defendant here? Judge Kuntz has indicated at the next status conference, which is set for March 28th, that he will set a trial date, which I should— Do you know the overall discovery yet? We've turned over virtually all the discovery and have indicated that we would turn over the rest of the discovery in the coming weeks and before that date. And then— Before the March 28th date. Yes, Your Honor. And I would note that, in fact, we've turned over more than 2 million pages' worth of discovery almost immediately. I was under the impression that there was some delay waiting for other possible co-defendants to be brought into the United States for trial. There are other co-defendants who are subject to extradition proceedings. However, as we said before the district court judge, we are ready for trial. So if the judge sets a date, yes, we'll be ready to try it. Is it your position that the conflict of interest that the judge identified is a factor arguing against retention of a third-party service in all cases? Or is it exaggerated in this case and why? Because it's my understanding that this has been done on several occasions, if not numerous occasions, and a guidepost has been used by the government and relied on in similar circumstances where the individual who had a risk of flight and faced a long sentence was allowed to be on bail before trial. Is the conflict an issue in all cases? Absolutely. Private jail is never going to be as good as detention in a government facility. However— That's the adequacy of it, but you've argued that there's a conflict. I mean, you may be right that it exists in all cases, but then how is it ever agreed to specifically since you all agreed to it in Subnani? I can't speak for the rest of the panel members, but I never would have gone along with that had the government not said that was a satisfactory condition. Absolutely. And, Your Honor, in that case, that's what the prosecutor's in applying the 18 U.S.C. 3142G factors to that particular defendant. There was a conflict there, right? It's the same conflict. They're being paid by the people who they're guarding. That's correct, Your Honor. If it wasn't a problem in Subnani, how is it a problem in this case? It is because the judge set out at least six reasons why he found a private jail inappropriate. Judge Kuntz in the district court, and this is at pages, essentially, 14 to 16 of his decision, sets out six reasons why he found that was one of them. And he said, first... If that doesn't speak, just one of the reasons was the conflict issue that Judge Raji and I are speaking with you about. He sets out other reasons, some of which seem to have been outdated. This was a month ago. He says the amount wasn't enough. He says that he distinguishes cases because there hadn't been a discussion of voluntary waiver of extradition. He said he had a concern about disparate treatment, about use of force, about the visa fraud in the UAE, and then the amount is sufficient. And a lot of these things, this is a month ago, it seems to me that it could have been the topic of discussion between the government and the defendant during this period. And one could have, if when we're acting on a sense of obligation under the Bail Reform Act to identify circumstances in which a non-convicted person could be released, that many of these conditions or concerns could have been addressed. But I take it that hasn't happened. Is that right? The defense counsel has not presented anything other than in their papers they've now raised some additional arguments. They haven't come to the government and said, hey, here are the conditions that we would ask you to consider. So in what, from the government's point of view as opposed to Judge Klintz's point of view, in what respect are the conditions that have been offered insufficient to reasonably assure his appearance in court? The conditions that have been set forward are insufficient because the defendant is a tremendous flight risk who has access to that flight. Well, everyone agrees that he's a flight risk, so I'd like to know in what respect particularly are the conditions insufficient to guarantee his appearance? The government believes that, well, first let me say that the government's position has been that no set of conditions would reasonably assure, short of detention, this defendant's appearance in court. However, because the defendant has access to vast financial resources, is closely tied to countries including Lebanon and the United Arab Emirates that do not extradite to the United States. And the means and the incentive to flee? And he has, yes, Your Honor, and he has a demonstrated ability to procure false entry documents which were set out. But the extradition, so if he were to come to you and say, I agree to extradition proceedings or analogs no matter where I may be, that wouldn't assuage your concern in that respect? We would certainly consider any package that the defendant presents to us. However, the... He can't find a foreign country. I'm sorry? He can say he'll agree to extradition all he wants, he can't find a foreign country. That's exactly right. And in this case, as we set out in our papers, the defendant is closely tied to the billionaire owner of Privinvest, his employer, who's an unindicted co-conspirator in the indictment. And that is the person who's going to pay for the virtual private jail solution that he is offering. And the government has legitimate concerns about the source of funds where, as we set out in the indictment, he received $15 million from this $2 billion fraud scheme and the point... You talk about disparate treatment, right? Yes, Your Honor. Disparate, what disparate? Disparate between whom? I thought from what I've seen that it was disparate between this defendant and co-defendants. Yes, Your Honor. But you just told me he's not waiting for co-defendants, he's going to be tried without co-defendants. That is very possible that the... Well, but then that doesn't make any sense. I mean, if it happens, fine, and your adversary says, if that happens, you can revisit it. But how can you talk about disparate when you don't have... Defendants when there's only one defendant? Your Honor, in United States v. Esposito, the court indicated that in that case, you would permit a virtual private jail for a wealthy defendant because there was no possibility of disparate treatment. And while there may not be immediately, I don't know when the other defendants will appear. It seems to keep them in jail because maybe someday there's going to be a disparate treatment of people who aren't before the court, and it can be changed if that happens. It's a very strange thing, it seems to me, to take into account at this point. Your Honor, in addition to those concerns about... And that the government had, in addition to those concerns regarding the potential for disparate treatment because it exists here, unlike those other cases, first, the cash was from an unverified source, and the government has issues regarding, again... That's not disparate treatment. Okay. Do you want to go on to another thing? That's fine. And so what I'm saying to Your Honor is that in addition to disparate treatment, there were other concerns. And those concerns... Yes. There's a different way to understand that, which is here, and that is disparate treatment means not just to these defendants, but the disparate treatment of a very wealthy person as opposed to somebody who isn't so wealthy. And that's a problem here too. I don't know that we are allowed or supposed to take it into account, but that's a disparate treatment also, and that makes some sense in this, whereas the use of it with co-defendants that don't exist. That's partly, I guess, because things are changing. When this all started, there was the notion that you were going to wait for other co-defendants, and now that's not the case. Well, Your Honor, it depends. For example, the judge has said he's going to set a trial date. It's possible that other co-defendants appear here in the next few months regardless. It's possible that you deal with it if it happens. Yes. That becomes relevant though too. We asked you how quickly you could go to trial, because if the defendant is going to get his case, he's going to have certain concerns that are viewed very differently if he's going to be in custody for more than a year. We've kept you past your time, but I want to ask you a question about your case, because the strength of the case is, of course, another factor that was considered here. What is the security that was fraudulently offered to United States investors? Your Honor, the security is the emetem security, which was a loan participation note. This involves two syndicated loans, and in the middle, there's a syndicated loan called Pro Indicus and one called MAM, and in the middle is a security. So the entire thing is wire fraud, and the thing in the middle, emetem, was a security. It was a loan participation note that was later sold as a Euro bond. These were sold to U.S. investors. And what's the fraudulent statement, material omission or statement, that was made to these investors? The loan agreements for all three of these loans, because these are principally loans, indicated that the— I'm interested in the security that was sold to U.S. investors. Yes, Your Honor. What's the false statement? The false statement— Fraudulent statement. The false statement is the use of proceeds and the explicit violation of an anti-bribery provision that was in all these loan agreements. The loan agreements and the materials that were marketed to investors claim that this was for boats and projects in Mozambique. And the government's indictment sets out, and this case will prove, that in fact those prices were grossly inflated. The $2 billion— I understand this. I read the indictment. But what's confusing to me is I thought from the indictment that the money was loaned to Mozambique by the two unidentified investment banks, who then created securities that were offered to the American public. Is that not right? It is with respect to Emington, which is a security, and the loan participation notes. I'm just interested in what was sold to U.S. investors, because that's the only basis for your bringing this charge in the United States, right? Well, yes and no. As we also set out, all of these loan agreements required that the money be paid from and to bank accounts in New York City. We'll get to that in a minute. And you had the investors— I'll get to that in a minute. I want you to answer my question. Yes. To the extent that the U.S. investors were putting up their money, who did that money go to? I didn't understand that their money went to the government in Mozambique. It went to whoever loaned the money to the government in Mozambique, right? It went to—oftentimes it went to the New York City bank account to be distributed to the—to actually—to the employer for this defendant, Mr. Boustany, Cribb Invest. So the money went to the bank, and then the bank gave it directly to Cribb Invest, which  Was Cribb Invest the issuer of the security? No, the issuer— You've got a lengthy indictment here. I don't understand what the security is or what the fraudulent statement is. So there's pages and pages about what went on in Mozambique, and you don't tell us what the fraudulent security is. I don't think you'd satisfy this if this were a simple complaint on what the fraud is in the instrument. But that—I think I've gotten enough to get a sense of what your case is. You're not trying it here, after all. But with respect to the money moving through U.S. accounts, how did the money moving through U.S. accounts contribute to the laundering or the fraud? I mean, I thought it was coincidental, and that under our case law, that wouldn't be enough to give you jurisdiction in the United States. What are you going to rest it on? Your Honor, among other things, first of all, these are conspiracy accounts. And the investors were—hundreds of millions of dollars in investments were sold into the United States. And those money went through, again, bank accounts in New York— Now I'm confused with the transactions that don't involve the investors, but that involve the money moving among the Confederates, which you, in your indictment, highlight, went through U.S. bank—clearing banks. And what's the case that allows you to say that the fact that that money went through U.S. clearing banks is enough to give you jurisdiction here in the United States? The name escapes me, but I know that there's the case where—there's a Southern District of New York case where the drug dealers are driving across the Gothel's Bridge. And the communication and furtherance of the conspiracy in the—over the territorial waters conveyed jurisdiction in the Southern District of New York. Bank clearing. And that—I mean, I assume, since this is the whole theory of your case, that you've got legal support for this being enough to give you a hook in the United States. Yes, Your Honor. And the wires did pass through the Eastern District of New York in going to those correspondent bank accounts. And since the wires passed through as part of this—and frankly, these were all denominated in U.S. dollar accounts. So this was always conceived of and known by the co-defendants that this, in fact, would occur. I expect you'll have some interesting litigation on all of this. I don't want to hold you— Let me ask just—let me just ask one—maybe—so I just wanted to make sure I understand. Is it the government's position that there is no bail package or condition of confinement package the defendant can offer that would provide reasonable assurance that he will appear in court? None. So there's no point in Mr. Jackson going back to the district court. Is that your position? The government's position is that there is no set of conditions that would reasonably assure his appearance. However, the government will always consider a bail package. Perhaps they'll convince us. I'm not saying it's likely, but I'll always look at a bail package rather than one that keeps changing. I think they have to present one. And I think the one that has been presented certainly is insufficient. And the district court did not commit clear error, because this was a factual finding, in finding it insufficient. Your adversary's argument is that that's not the proper way to look at it, that it's not their burden to show that a particular bail package is adequate, though they often do that in cases when they are proper to the district court. It's yours to show that there is no reasonable . . . there is no package available. Now, as I understand it, neither your position in the district court nor the district court's finding is . . . was, well, there may be one, but it's not this. And I'm not going to speculate now as to what that would be. I'll consider whatever you present to me. That's not what the district court said. The district court said, and I thought was the government's position, there is no conditions here that would satisfy it. So if that's your position, we just want to know, you know, how you justify it. You just said you're willing to entertain a bail application. That suggests you think there might be one that would satisfy it. No. We do think the government is . . . does believe that no set of conditions would reasonably assure his appearance. However, I just meant that we would always consider something if the defendant raised . . . our position is that no set of conditions would reasonably assure his appearance. I find that disturbing. And I find it disturbing because there's some . . . there's a dynamic at work here which I find disturbing and affects me and you, and that is, let's say the chances are 1 in 10,000 that he would flee if he goes under this . . . if he is the 1 in 10,000, if he's the other . . . I can't subtract 1 from 10,000, but if he's . . . but if he's any of those and he shows up to the trial because he has to, no one will remember this. He'll remember it. No one will remember this. If he's the 1 in 10,000, they're going to blame you and they're going to blame me. And that sure puts the . . . puts me . . . I'm not speaking for my colleague, me in something of a . . . to worry about whether I'm really approaching this logically or whether I'm protecting myself from that 1 in 10,000 and whether you are. And, Your Honor, that's exactly why the district court in this case . . . The district court is in the same position. Yes. And why the district court, in recognizing this inherent conflict of interest, the possibility is shown in the Enlap-Seng case of there being . . . But Mr. Seng showed up. Mr. Seng, yes, he was at some Chinese restaurant at some point, but he showed up. He did show up. He did not. His appearance was reasonably assured. It was, however, Your Honor, in that case, as we pointed out and as the district court noted, the defendant received something in the order of 160 hours of medical massage in a 30-day period, was out at the Chinese restaurant. But the question is, was his presence reasonably assured by the conditions imposed? And he showed up. The district court found in that case involving that 67-year-old defendant who did show up that those conditions were sufficient. However, a defendant in a related case, Patrick Ho, was detained by Judge Forrest. So different people will assess circumstances in different ways, but we were talking about And I have some difficulty understanding why these extraordinary conditions that are outlined here wouldn't do so. Okay. Why don't you make one final point? Yes, Your Honor. We've let you get away over your time. Yes, Your Honor. Just that different courts will make different decisions in assessing something, and this district court reasonably, just like Judge Forrest did in her case involving a similarly This defendant, based upon the reasons set out by the district court, including the access to vast financial resources, the demonstrated ability to procure false entry documents to foreign jurisdictions, found that he should be detained. Her permit to the UAE was hardly a false U.S. passport or a document of that magnitude or gravity. And three false fraudulent visas to enter for co-conspirators who were indicated as petrol mechanic, petrol engine. We have the argument. Right. Who were, in fact, government. Two of them were government officials. And, Your Honor, just to your point before, I forgot, but now I remember the case, United States v. Rotiliano, regarding passage of wires through the district with respect to venue and jurisdiction. Thank you very much. Thank you very much, Your Honor. Mr. Jackson, you have a minute rebuttal. Thank you, Your Honor. I'd just like to make a few brief points in response and answer any questions the court has. One, I think the issue was raised of disparate treatment. And I just wanted to note, just a sec, the question that Your Honor raised in terms of disparate treatment, I think what's particularly important to remember is what this court said, noted in both Subnani and Esposito, that where the government is relying on the wealth of the defendant as a very significant factor in terms of the need to detain the defendant, then it's particularly unfair to conclude that that wealth can't be utilized in order to try to create conditions. You're wealthy, and therefore, you have to stay in jail. But you're wealthy, and therefore, you can't have an alternate means of assuring your wealth. Exactly, Your Honor. Let's talk about your client's wealth to see the issue that you raised about there not being any conditions not being adequately shown. Part of the court's concern was the million dollars and where it came from. Is your client prepared to make a full disclosure of all his assets everywhere in the world so that the court has a sense of what his wealth is and whether a million dollars is  Absolutely, Your Honor. Not only is he willing to, he already has. He sat down with pretrial services, outlined all of his assets. His wife outlined all their assets overseas. The government never at any point... How can pretrial services verify that? There's an extent to which they can verify. I don't know all their investigative methods, but there was never any allegation in the district court. Unlike in Subnani, there was never any allegation in the district court that my client had hidden any of his wealth. He identified his bank accounts where he had money. He expressed his willingness to transfer wealth here in order to secure his bond. More to that point, Your Honor, I would just emphasize that with regard to the 1 in 10,000 point, the Supreme Court has repeatedly emphasized that the fact that there is some theoretical risk that a defendant might be able to escape is really grossly insufficient. For us to justify detaining a person who is presumed innocent, that the entire point of the constitutional right to bail and of the Bail Reform Act is that we're willing to deal with some minuscule risk in order to assure that the very fundamental value of our criminal justice system, the fact that a man is presumed innocent until proven guilty is not completely run over by the government's ability to detain him perhaps for a period of years. Is there any unarticulated concern that we might have about only the wealthy being able to afford private detention? I think, Your Honor, that it's an important concern and it's one that I think everyone who's a stakeholder in the justice system cares about, but I think Judge Redcliffe, in his opinion in the Dreyer case, really hit the nail on the head with this issue. Everything in terms of bail, unfortunately, to some degree, prejudices people who have less means. If you're homeless, you don't have the ability to put up a home. You probably don't have the ability to put up any money. What we have in this situation is a defendant who's really being penalized for having more money than the average defendant, and in this particular situation, I would just suggest, Your Honor, To penalize, the question is whether or not the package provides a sufficient deterrent. When your mother puts up her home and your beloved mother's going to be out on the street if you abscond, that's often a strong deterrent because it has a moral suasion component as well as the value of the home. Indeed, often the judges don't care what the value of the home is if mom's going to be on the street, but that's not your client's situation. What we've got here is a relatively modest amount of his assets coupled with private detention services. It's in that context that I asked you why isn't this troubling, that it comes only to the wealthy and not even your client's money, a potential co-conspirator. Well, I think that Your Honor hits it on the head when you talk about the mother's home because what that identifies is that the Bail Reform Act is focused on focusing on the individual defendant, and the mother's home is a situation where the court has the ability to create flexible solutions for different types of defendants. There will be some defendants who don't need 24-hour private security monitoring, and they can achieve the goals of the Bail Reform Act simply by making the mother a cosigner on a significant bond. For this particular defendant, we don't believe that this is necessary because our client, as Your Honor identified, is fully aware of all the significant problems in the indictment and has a very strong interest in clearing his name. His wife is here waiting for him to fight this case because they have an interest in clearing their name, but these conditions we suggested go far beyond what is necessary. They go to the point of virtually guaranteeing that this defendant cannot flee. So no matter what can be said about the potential risk of flight, there is no articulation, and there was no articulation when Your Honors pressed the government on this question, why would this fail? Why would this fail? The government can't answer that question. No one can answer that question, and under those circumstances, Your Honor, we submit that the defendant should be released. Thank you very much for your time. We'll take the matter under advisement and try to get you a decision promptly. Thank you, Your Honor. We'll proceed to the next case on the calendar, Siegel v. HSBC, No. 18-2540. May it please the Court, William Gibbs on behalf of the Plaintiff Appellants. Your Honors, we seek today reversal of the District Court's granting of the defendant's 12b-6 motion to dismiss. Our Anti-Terrorism Act case against HSB defendants located here in New York, and we premised the dismissed complaint on the amendment to the ATA that I will refer to as JASTA. The way that this case played out was that we had a conference with Judge Cote immediately after Judge Radji had authored the Lind opinion, at which time Judge Cote provided some guidance and said we should tailor any amended complaint in accordance with the Lind opinion. We did attempt to do that. In doing that, we eliminated our allegations of primary liability under the ATA and focused our allegations on aiding and abetting liability pursuant to JASTA. What you have to have aided and abetted was the November 2005 bombings in Jordan, right? Yes. Right. Now, HSBC did not deal with the terrorists responsible for those bombings. They dealt with the Saudi Bank, which you say allegedly did so. So how did they aid and abet the terrorists by their dealings with Saudi Bank? And in that, I need you to consider the fact that they had not dealt with the Saudi Bank for 10 months before the attack. Yes. So that is where the parties disagree, really, on the plain language of JASTA. JASTA provides for a cause of action against, and I quote, any person who aids and abets by knowingly providing substantial assistance, or What? Substantial assistance to what? It goes on, comma, or conspires with the person who committed such an act of international terrorism. I believe that should be read by knowingly providing substantial assistance to the act of international terrorism. Right. The act of international terrorism here is the 2005 Jordan bombing. Correct. Okay. And so Congress said the purpose of the amendment was to provide civil litigants with the broadest possible basis consistent with the Constitution of the United States to seek So you're looking at 18 U.S.C. 2333 D2, right? Yes. And you're reading any person, liability may be asserted as to any person who aids and abets by knowingly providing substantial assistance, or who conspires with the person who committed. So aiding and abetting the person, or conspiring with the person. Are you saying aiding and abetting means providing substantial assistance to the act somehow? Yes. To the act, not to the people. That is ultimately where we disagree, I think, in the briefs, is that the defendant's view of that is that one must aid and abet the person who commits the terrorist act. And you're saying you're providing assistance to an One can aid and abet by providing substantial assistance to facilitate the act. Don't aid and abet an act, or? Don't aid and abet an act. So what's really interesting about the JASTA amendment is that it specifically cites to the Halberstam opinion out of D.C. Circuit. D.C. Circuit, yes. And that's a very interesting case that we read last night. And in that case, Mrs. Halberstam's husband was killed during the commission of a burglary by sort of a well-renowned burglar. And the defendant at issue in the opinion was his girlfriend and secretary, who did not know that he was out burglarizing that night, did not know certainly that he was going to kill Mr. Halberstam, but was aware of his scheme to burglarize because she was living on the profits of the burglary scheme. But Judge Wald says in that opinion that aiding and abetting focuses on whether a defendant knowingly gave substantial assistance to someone who performed conduct. It wasn't just like in the ether. Agreed. Agreed. And according to Halberstam, it's concerted action by substantial assistance. And that's what I think we have here is HSBC and — You're pulling that phrase out. There's a three-part general test and then a six-factor test that Halberstam articulates. And to the extent it's adopted, Lind identifies what aiding and abetting means in the civil context. It's very different what it means in the criminal context. But one of the three initial parts of the definition is the defendant must be generally aware of his role as part of an overall illegal or torturous activity at the time he provides the assistance. I need you to explain to me how the pleadings establish that. And then in the six factors, it asks to consider the defendant's presence or absence at the time of the tort, defendant's relation to the principal — the principal now is the terrorist — and the period of the defendant's assistance. And that's just three of the six factors, but I'm not sure how any of them weigh in your favor. Help me out. As to general awareness, Your Honor said it best in Lind, nor does awareness require proof that, in that case Arab Bank, knew of the specific attacks. But you have to know you're helping terrorists. You have to know you're helping terrorists. And where are the allegations that would support that inference here? And that's where I turn to our complaint in which we quote then U.S. Attorney for the Eastern District Loretta Lynch as stating HSBC's willful flouting of U.S. sanctions — this is paragraph 89. 89? Yes, ma'am. Go ahead. HSBC's willful flouting of U.S. sanctions laws and regulations resulted in the processing of hundreds of millions of dollars in OFAC-prohibited transactions. We go on in paragraph 90. Using their scheme to evade OFAC filters by stripping identifying information, the HSBC defendants provided Al-Raji Bank with a wide range of banking services both inside and outside the United States. These services include U.S. dollars, wire transfers, foreign exchange, trade financing, and asset management services. And then we go to the Senate report, which is paragraph 63, in which the Senate report says that HSBC has a legal obligation to take reasonable steps to ensure that it is not dealing with banks that may have links to or facilitate terrorist financing. After the 9-11 terrorist attacks in 2001, evidence began to emerge that Al-Raji Bank and some of its owners had links to financing organizations associated with terrorism, including evidence that the bank's key founder was an early financial benefactor of Al-Qaeda. And this is where this case is different. That is our established precedent that merely because you deal with a bank that has had dealings with terrorists does not make your dealings with the bank aiding and abetting terrorism. I mean, Lind reiterates that, and that has been the holding of this court. Lind reiterated that in regard to primary liability. I don't believe that this court has yet addressed secondary liability, aiding and abetting liability in this context. And I point you to an opinion that's talked about in Halberstam, which is sort of an antiquated case, but it provides for an interesting analogy. And in that case, Halberstam cites to a case called Grimm. Grimm is where four boys are ultimately, one of the boys is sued by an insurance company. These four boys broke into a school, and the boy that didn't, because they wanted to get some pops or whatever it was, and they brought in torches, two boys brought in torches to guide their way through the school, and ultimately the school went up in flames. And the fourth boy, who did not have a torch, did not know torches would be used, was found to be providing substantial assistance, aiding and abetting the act. And that is HSBC here. HSBC certainly provided the dollars to Boy 3 for Boy 2 to go get these torches and lighters, but it didn't go directly from HSBC to the terrorists. I cannot allege that it did. I cannot allege that HSBC was the one that conspired with the terrorists, and we have not done so. What we believe the law to be under JASTA is that when you participate in a scheme with a bank such as El Raji Bank, that was so prominently known to be a terrorist financing bank, that you have aided and abetted the terrorist organization's commission of a heinous attack on November 9, 2005. Thank you. I think we have the arguments. We'll hear from Mr. Pincus. Thank you, Your Honor. Andrew Pincus, and may it please the Court. Andrew Pincus, representing the HSBC U.S. entities. I want to turn to the specific questions the Court has, but I'd like to make two general points, just stepping back from the specific issues here. An important characteristic of secondary liability, such as aiding and abetting, is that the conduct by itself does not have to be unlawful, and frequently it is not. What creates the liability are the mental elements and the conduct elements regarding the relationship of the alleged aiding and abetting to the primary wrongdoer in his act. And if they're too loose and vague, aiding and abetting can be overly expansive and show legitimate conduct. And Judge Cote made that point with respect to the banking system, and I think the amicus brief does that here as well. I'm curious about your use of the term secondary liability. Secondary liability in the sense that usually I think that means that it's there only if the person who's primary liable can't pay. Is that so here, or does that mean something else here? I don't think that's true as a general matter, Your Honor. I don't think a plaintiff is required to sue the primary violator. Just using the term, the question of the use of the term and what it means. In some cases, I'm sure it is true that the person who is secondarily liable is the person who pays if the person who is primary liable doesn't or can't. In this case, it's being used in a different sense. Is that fair? I think it's used generally in the same sense, which is this is not the principal wrongdoer. It is a legal theory that imposes liability on someone who is not the principal wrongdoer who directly injured the plaintiff. And I think that's true in all contexts. I also think it's important to distinguish the factual setting here from the one in Lind, because Lind really sets the framework for this case. And there, of course, the alleged aider and abettor had provided banking systems services to the terrorist claimed to commit the attack. Here, as our strategy noted, ARB is in between the allegation and the terrorist. There's no allegation that HSBC US banked the terrorist. There's not even an allegation that there was US clearing with respect to terrorist accounts. And there's no allegation that ARB did not have legitimate business. It is, I think, the complaint alleges that it's the largest bank in Saudi Arabia. It has 500 branches. And so the claim here... The situation where we have a claim that your client is an aider and abettor of an aider and abettor of the terrorist attack? Is that where we're getting here? I think that's basically what we have here. The first element of Halberstam is the party whom the defendant aids must perform a wrongful act that causes injury. I had assumed that was the terrorist, but we have this intervening actor here. And I think that is a reason why... I'm sorry, Your Honor. I think that's a reason why the Lind factor, that first factor, is not met here, because Lind does say, quoting Halberstam, that the aid has to be given to the primary wrongdoer, and as Judge... I'm not sure that's... I mean, you know, again, drawing from the criminal context, which is not exactly what we're doing here, there can be all different sorts of aiders and abettors. I mean, someone can agree to carry out a scheme for the principal, and then someone drives that person to the crime scene. I mean, you could view him as an aider and abettor of an aider and abettor, but they'd all still be liable. But I think there the claim would be that the aider and abettor meets the test with respect to the primary wrongdoer. And here I think there's really no relationship. As Judge Koch said, there really is a relationship between HSBC-U.S. and al-Rajhi Bank, and then, separately alleged, a relationship between al-Rajhi Bank and the terrorists. And the argument here is not that anything HSBC did was sort of a link in the chain, knowingly, or even with any awareness that it was doing things that facilitated terrorism. So we don't have the first element, which is the link, and we don't... I mean, you do have the facts set forth in the Deferred Prosecution Agreement. I mean, there was activity undertaken by the bank, it appears, to avoid some of the impact of sanctions and to assist individuals who were otherwise kind of on a blacklist. And I think what your adversary is saying, that that kind of knowledge and deliberate activity by the bank, which the government found objectionable, is enough of an awareness that it was participating to follow the causal chain. Why is that wrong? Well, several points about that, and Judge Koch sets these out in footnote 1 of her opinion. First of all, there's no allegation of stripping of information with respect to any of the al-Rajhi Bank transactions, which are the transactions at issue here. But more fundamentally, the defendants here are U.S. entities, and U.S. entities are the victims of stripping. They're not the strippers. Because what happens is a foreign bank takes out from the information that it sends to the U.S. bank to get the clearing transaction done, information that identifies the party or the country that might trigger some kind of additional scrutiny. And here, so the HSBC entities here were the recipients of that information. They were not stripping information, and so they couldn't possibly. Is there some kind of allegation about requests to be short-stripped the information out of incoming? I don't think there's anything with respect to al-Rajhi. Again, nothing with respect to the transactions that are alleged here. There was something in the agreement with respect to other HSBC-related entities that were sending clearing transactions, but here we have a totally unrelated entity. So I think the stripping sort of falls out of the case for that reason. And for that reason, there's really on the second prong the awareness of aiding terrorist activities. Here, HSBC was engaged in transactions with al-Rajhi that, at least based on the allegations of the complaint, it had no knowledge that those particular transactions had anything to do with terrorism. The allegation is somehow the bank al-Rajhi perhaps was helping terrorist activities, but there's nothing that would let HSBC-U.S. know that its involvement had anything to do with that. Quite to the contrary, as I said, nothing to do with terrorist-related accounts at all. So that second element is missing, and then we come to the third element, the substantial assistance element, and there, too, ticking through those six factors, nature of the act encouraged in relation to the assistance, it has to be integral or play a major part. Here, the whole allegation is essentially money is fungible. There's really no allegation that this particular money had anything to do with it. The amount of assistance, presence and absence at the tort. I think, by the way, that first factor distinguishes my friend's tort example, because obviously the provision of that tort, like the provision of a model's photo in another case that George Walt's opinion addressed, was sort of a critical element of the principal offense. Here, there's no allegation of that. And critically, there's no allegation that any HSBC defendant was present at the offense. The relationship is quite distant. The intent element, which is another question on substantial assistance, is lacking here, and the time period, as Judge Raji mentioned, the ten-month gap, is highly significant, as Judge Koch found. So we think here, sort of again stepping back, that the presence of Al-Raji here is sort of in the middle, is similar, although the test is somewhat different, to the observation that the court made with respect to proximate cause in Rothstein with respect to Iran, that here, there the court said Iran is a country that may be supporting terrorism, but it has legitimate activities as well, and so merely dealing with Iran can't possibly give rise to a proximate cause test. Here, I think, merely dealing with Al-Raji, which everyone agrees has legitimate business, on legitimate business, there's no dispute there, breaks all of the three factors, the relationship test, the awareness test, and the substantial allegation test. The other thing that my friend relies on here, which I think is important to point out, is an argument that somehow Twombly and Iqbal apply differently in the Alien Tort Act context, and I think it's important to point out that's not true, that this court has rejected in several cases the argument that there's some separate rule that's case specific that exempts them from the ordinary pleading requirements, and I think it's important to point out that here, too, the rule is exactly the same. Thank you very much. Thank you. I hope you and my colleagues will forgive me for the observation that apparently how few people know what HSBC stands for. Shanghai Back Corporation? Yes. Thank you very much. Mr. Gibbs, you have reserved three minutes for rebuttal. Thank you. Briefly, the tracing causation that is proposed by HSBC is not a requirement of the law. The Weiss case said it very well when it said, you're not required to show that the funds attributed to the defendants were used, quote, to buy the specific weapons and train the specific men who killed or injured the plaintiffs. And the Straus v. Credit Linaise case said such a task would be impossible. It would make the ATA a practically dead letter. And so the 10-month gap is a bit of a red herring in the sense that terrorist activities don't just occur overnight. For instance, we know that this was perpetrated by AQI, al-Qaeda in Iraq. al-Zaqqari is the man that was in charge of that organization at the time. And in order to get a bomb and bombers, in this case there were three hotels across Amman, Jordan, that were bombed simultaneously. Our hotel that's at issue with our plaintiffs was a husband and wife team. They had been trained by AQI along with their fellow bombers for years. Those bombs needed to be built. They needed to train people on how to build those bombs. So just because the night before HSBC says you can't have any more money to al-Raji Bank or al-Raji says that to AQI, that's not what's at issue here. What's at issue here is the general awareness that for decades, literally decades, al-Raji Bank was involved with terrorists and HSBC made a business decision to continue their relationship with al-Raji despite a lot of evidence that al-Raji was very involved with AQI. You dispute the argument made by your adversary that that's not all al-Raji Bank did. They had legitimate customers as well. I don't dispute that. To that extent, it's hard for me to know how simply supplying money to the bank is a substantial act in furtherance of the tortious activity here. It has to knowingly and substantially assist the principal violation. Now, I agree with you. That doesn't mean they have to know of the specific attack that took place, but they have to be providing that money knowing that it's going to go for a terrorist attack. I think that the parts of the complaint you read to us just have links of the bank to terrorist supporters, organizations, etc., but not any suggestion that everybody who dealt with the bank therefore knew that they were helping to support terrorism. I think the question is one of foreseeability, as it often is in tort law. You have to have a plausible theory that they would have understood that by doing this, they were supporting what came to be the 2010 attack in Lebanon. And I think the specific citations in the complaint as to HSBC's long-standing general awareness of al-Raji Banks, there was a CIA report, I think it was in 2003, I believe. There were numerous instances back in the 2000s, after 9-11, in which al-Raji was not just linked, but shown to be... Yes? During these years, did al-Raji have access to the United States banking system? I mean, most banks need it to clear their accounts. Through HSBC. Right. But the United States did not cut them off. That is accurate. See, that's the problem, is that to the extent that what you're relying on is routine banking activity, not as in Lind, funding accounts for someone who was a known terrorist, or sending money to people who were known terrorists through the bank, knowingly doing it. That's not here. You're talking about if you know that another bank has links to terrorism, you're conducting routine banking activity with them, is aiding and abetting terrorism. Is that what you need us to hold here? If there is a general awareness of that bank's connections to terrorism, I believe JASTA says yes. Do you have any allegation that before the 2010 attack, that any money from the al-Raji bank made a terrorist attack possible? I'm sorry, we're talking about a 2005 attack. I'm sorry, 2005, I misspoke. Thank you. I'm sorry, I lost you. Do you have any pleading that before the attack, because they stopped dealing with them some months before the attack, there was any reason to know that money from the bank was funding terrorist attacks? Not merely helping terrorists move their money around or anything like that. Funding terrorist attacks. I do not have that evidence at this time. And I think, you know, posture is important. This is a 12B6 motion. Lind was after a jury trial. And I believe, I agree, I embrace Iqbal and Twombly. That is what is required. And we have set forth a cause of action in the pleadings that should proceed and dismissal should be reversed. Thank you very much. Thank you. We'll reserve decision. The next case to be argued this morning is Klein v. Touch Tunes Music Corporation, number 18, 1756. Thank you. Good morning, Your Honor. May I please report? Jeffrey Norton for the appellant. Excuse me, Mr. Norton. Could you move over and speak into the microphone? Thank you. Thank you. I apologize. Jeffrey Norton for the appellant. Thank you very much. While we understand that the district court has considerable discretion in fee awards concerning class settlements, class action settlements, that discretion must still be guided by Rule 23, an established Second Circuit precedent. Here, following four years of litigation, the court was presented with a settlement specifically tailored to resolve the remaining claims in that action shaped by the court, and it's found that that settlement was fair, reasonable, and adequate. However, when presented with an uncontested, modest, and negative multiplier fee request that was negotiated independent from and was independent from any benefits to the class, did not reduce benefits to the class, the district court completely abandoned its role as a fiduciary for the class under Rule 23 and departed from clear authority in this circuit. It substituted its own business judgment for that of the parties. It concerned itself with the interests of corporations and the defendant in particular. It disregarded the Goldberg factors. On what basis do you make that claim, that it concerned itself with the interests of corporations? Doesn't the district court have the discretion in a fund case to use Lodestar or the fund created and to award a reasonable amount of fees, and it exercised that discretion in assessing how best to calculate an award? Why do you say it was kind of expressing a predilection towards protecting corporate interests? Well, Judge Kaplan specifically said that he viewed this action as a nuisance action, that it was a squeegee man theory of fees, and that it was a tax on corporations, and he wasn't going to allow that. So he expressed a view that the case itself wasn't worth very much in terms of public interest for the class and so on. He did express that opinion, but bear in mind, this case was much broader, much more complex at its outset. It went on through multiple pleadings. That was Judge Kaplan's point that it just kept shrinking as parts of the case became less and less tenable. Correct, Your Honor. I'm not sure it helps you to argue, well, it was a bigger case when it started, because as it emerged, it should never have been that big a case. That was his point anyway. Respectfully, Your Honor, looking at the Goldberg factors and the complexities of the matter, the complexities are viewed from the outset. How was this case constituted originally? Now, we took a— Consider whether it was made more complex than it needed to be by counsel, and that would warrant a discount in the fees. The counsel made it more complex than was warranted. No, Your Honor. At no time in the four years of litigation did Judge Kaplan once express the opinion that this case lacked merit, was a nuisance case. He was looking at it in the light, most favorable to one side or the other as the law required, and it was only after the merits were resolved through the settlement that he expressed the views he did about what had happened in the litigation. But throughout the litigation, he focused on the merits of the parties' claims. Right. So we were left in a position. We had a meritorious claim, a smaller class, and we did the prudent— our choices were to walk away from a claim that was deemed meritorious, litigate that claim to some great extent, an expense, or resolve the claims that the court expressly left viable. And we did the prudent thing on behalf of the class, and we came up with a settlement that was specifically tailored to address what was left of the class. In fact, we ended up getting more relief than we probably could have at trial on that particular claim. And Judge Kaplan also disregarded, in addition to the benefits that we achieved that he valued, he didn't give any value to the structural and non-quantifiable benefits at all. He didn't even refer to them in his order. You mean the change in the disclaimer? Change in the disclaimer, which was specifically his point in sustaining the 349 claim, was that the company failed to disclose the ability to skip songs, venues— But he had already said—the disclaimer was already in place that there would be no refund under any circumstances, right? That was pre-existing the suit. That was the disclaimer by the defendant. They had the disclaimer, but not— but it wasn't a fulsome disclaimer about this particular matter, which the court said was still deceptive. Let me ask you a question. With regards to the debate over whether the award should have been based on the amount of—how to say this— not the actual redemption rate, but the overall kind of pool created that was redeemed, I was looking at CAFA and seeing its provisions regarding coupon settlements, which this seems to be. All users of the jukebox system were entitled then to a credit, and only a certain percentage, which Judge Kaplan thought would be relatively small, might redeem those coupons. And so CAFA seems to, in 28 U.S.C. 1712a, anticipate similar settlements where only partial redemption actually occurs. Do you disagree that that part of CAFA governs this settlement? We think this case is a little bit of a different animal, not necessarily a coupon settlement, because basically it was a reversion of, you know, people lost a particular unit of value, and they received back a particular unit of value, unlike the coupon, which could be unrelated to the original loss. Here, they received back exactly what they lost, in addition to other non-quantifiable benefits. Nonetheless, they're getting an opportunity to use the system that is, in my view, equivalent to the kind of coupon that may or may not be used ultimately. It's not like there's money that's getting distributed to everyone, right? That's true. There's not money being distributed to everyone. In this case, I mean, I think the Second Circuit President is fairly clear on this point, that it went even further than basing it on whether or not people got that credit or made a claim for that credit. It was irrelevant to the district court. It's whether they ultimately used it, and we don't think that's particularly fair, or supported by the Second Circuit President and Gamert or others. I think you preserved three minutes for rebuttal. Thank you. Thank you, Your Honors, and may it please the Court, I'm Joseph Palmore here on behalf of Touchtoons. Judge Kaplan acted well within his broad discretion in directly correlating counsel's fees to the concrete benefit that the settlement provided to the class. This practical approach was particularly warranted because counsel failed to fulfill his mandatory obligation under Carey to substantiate his billable time in support of a lodestar. Let me ask you about that. I gathered that contemporaneous billing records weren't provided in the initial application, this kind of summary, but counsel seemed to have offered to provide contemporaneous billing records for the courts-in-camera examination. Why wasn't it of use of discretion for the district court to reject that offer? Because that was insufficient. It was too little, too late, Your Honor. Since 1983 and the Carey decision, it has been mandatory in this circuit for counsel seeking lodestar compensation to provide billable records. That's the threshold requirement. This was the final confirmation hearing. It had been scheduled months in advance. Counsel was required to support his request for fees with those billable records. And it wasn't sufficient for him to say, I will comply with this mandatory obligation at some later date, and it's not correct for him to say that Judge Kaplan abused his discretion by declining to adjourn the final confirmation hearing in order to allow counsel to do what he was supposed to do from the beginning. It couldn't be clearer under Carey, under Scott, that this is a mandatory, hard-and-fast rule. And if you look at what counsel provided, it was simply a summary table. It's about 2 inches tall in his fee application, just with a gross aggregate number of hours and a fee, and that's not sufficient. So lodestar was off the table as an option here. Judge Kaplan then had no choice if he was going to award fees at all, but to award them in relation to the benefits that were provided under the settlement. Do you agree that the CAFA coupon provision that I was referring to earlier could be looked to as governing the redemption or no-redemption provision aspect of the order? Yes, Your Honor, it could definitely be looked to. At the very least, it's a very sound analogy. It's an equivalent to the coupons under CAFA or equivalent to the credits applied here. Of course, it's not just CAFA, the complex litigation manual which we cite in our brief. There was actually a recent amendment to the advisory committee notes under Rule 23 that expressly endorsed this kind of calculation of fees, waiting until you see what the actual redemption rate is so that the fees are correlated to the actual concrete benefits that are provided to the class. And of course, numerous district courts in this circuit, and we cite those in footnote 2 of our brief, have calculated fees in exactly this way. It's a very practical way of ensuring that there is a correlation between the fee paid to counsel and the concrete actual benefits provided to the class, not just the theoretical benefits. So Judge Kaplan couldn't have abused his discretion by using that very method that's been endorsed through all of those mechanisms and is, in fact, the only way to calculate fees in a coupon settlement under CAFA. And in terms of the complexity of the case, Judge Raja, you pointed out something that's quite apt here, which is that the case was unnecessarily complex from the beginning. There was a sua sponte dismissal for failure to allege jurisdiction properly. We had to move to dismiss twice. It was dismissed in its entirety the first time with leave to replead. It was dismissed almost in its entirety the second time, as counsel acknowledged. Only a sliver of the case was left. So it was actually quite simple at the end of the day. And in terms of the effort that counsel extended over the life of the case, it was really filing complaints, resisting motions to dismiss, and amending the complaints. There was no discovery. There was no actual fact litigation in this case. And the parties arrived at a reasonable compromise and settlement to reflect the sliver of the case that was left and to provide relief to the class that was commensurate with that sliver of the case. And the fee award that Judge Kaplan awarded, and I should note parenthetically here that we don't even know what that final number is going to be because we're still within the period in which members of the class can redeem these credits, that fee award was commensurate to the concrete benefits that the class got. Your adversary suggested the district court went afoul of his or didn't fulfill his fiduciary obligation to the class and not awarding fees and costs and so on as had been anticipated in the settlement agreement. What's your comment on that? No, I think that's not correct, Your Honor. What Rule 23H says is that all fee awards and class actions have to be reasonable. It doesn't differentiate on whether the money comes from the class or comes directly from the defendant. There is this overarching reasonableness requirement. Always applies. And there is a systemic interest in having district courts do what Judge Kaplan did here, which is police the reasonableness of fees even if they're not contested in the district court. That is part of the district court's fiduciary obligation not only to the class in a particular case but to the system and the fairness of class action litigation overall. As I understand it, you all agreed to pay a larger amount than the district court ultimately awarded. Is that correct? That's not quite correct, Your Honor. We agreed in the district court not to oppose. We didn't endorse, we didn't agree. We just said we will not oppose up to $100,000. And whatever amount was awarded, it was not going to diminish the amount or the recovery for the class, correct? That's correct, Your Honor. If the court has no further questions, we would ask that the judgment be affirmed. Mr. Norton, 3 minutes. With regard to the Lodestar summaries, Lodestar summaries like that are routinely included in fee applications. Let me ask you, though, is it correct that the Lodestar summaries did not apply the billing rates in effect at the time the services were rendered? Your Honor, on that... Is that correct? That's correct, but Second Circuit precedent, and there are a number of cases that say that current rates is the proper rate to use because it contemplates the risk and the time... Doesn't it depend on how the extent of the time and so on? And I think it would have been appropriate still to provide the then applicable rate rather than the highest rate applicable during the period, no? Perhaps, Your Honor. But, again, twice we offered to produce the records, both in our application... Why not produce right away? I mean, counsel is right. That's no new requirement. It's not new, but there are dozens and dozens of cases where summaries, just like the one we did, where fees are granted, and the only time, you know, often if there's objections or there's some question as to excessive billing or some other reason to doubt the veracity of the summary contained in the attorney declaration that would require that to... But here, we have... I remember seeing that when I was on the district court, and especially in a class action where the judge had specific fiduciary obligations, as you've pointed out. But just tell us why. Why didn't you provide them? I mean, there's plenty of case law out there saying they are required. Your Honor, I suppose it was based on former practice where it had been accepted the way we had done it. Right. Now, if you're at the final proceeding and the judge is not going to let you delay things further, why is that an abuse of discretion? Well, he didn't have to delay things. He could have been subject. He could have granted it subject to supplementing the record. That happens all the time as well. There was no reason for him to just throw that out. Really? And it was... Well, I think... I don't think that's exactly what judges wouldn't do because they're basing it on nothing. I mean, they need to review the contemporaneous records to be certain that they're reasonable. Your Honor... So let's put aside the granted subject to confirming that it's okay. What makes you say that it's an abuse of discretion for a judge who has not offered contemporaneous billing records until the final appearance that that's an abuse of discretion? What do you rely on for that? It wasn't the final appearance because we had... he had had our motion for fees for 2 months and Judge Kaplan had never been shy about telling us to supplement anything that we had submitted to the court within minutes of submitting it. When was it that you offered to supply your records? Because that's what I was... Two months prior to the final approval hearing. When did you do that and what submission so that I don't over... That was the motion for approval of fees. Where we... the summaries were contained. Oh, so you submitted your summaries and therein you said what? And therein we said, this summary is all based on the firm's contemporaneous time records and they will be provided at the court's request to review. And then repeated that again in open court and that was disregarded. And I would just point out that in a case like this where the fees are agreed to, they could say they weren't going to oppose, but that's just semantics, that the fees are agreed to, the benefit doesn't reduce... it doesn't reduce any benefit to the class, case law in this circuit is clear that the court's fiduciary role is greatly diminished because the reason for scrutinizing those fees is because the court acts as a fiduciary for the class and there's no conflict of interest. Where... The court has the authority, though, to choose between a fund approach and a lodestar approach in a class action such as this? It does. We actually think that the lodestar approach was probably the better approach here and we submitted a lodestar request that was negative .47 of our billable time. We cut over more than half of our time in this case in contemplation, in consideration, but yes, this was a far more narrow case. Ultimately, after expenses, which I didn't address, he also just for no reason didn't allow expenses or incentive award without giving any real reason for that, but... At the end of the day, it was basically an $87,000 fee over four years of litigation, like I said, cut in half. So even as a percentage of the benefit, depending on how you calculate it, we think it could still be justified. Thank you. Thank you very much. A well-reserved decision. Thank you both. The final case on the calendar for argument this morning is McLeod v. Mickle, number 18-1272. Thank you. Good morning, Your Honors. My name is Thomas McLeod. I'm the pro se plaintiff appellate. May it please the Court. There's a natural tension between Civil Rule 8's advice   and the plaintiff's argument for a simple, concise, and direct statement of a complaint and Twomley's plausibility pleasing standard. But this complaint sets out a minor constitutional violation, essentially holding a motorist for an extra 15 or 20 minutes for the purpose of bringing drug-sniffing dogs from down the road. From the point of view of the detained motorist, the case is simple. You're at a rainbow gathering, a place where there has been media reports and ongoing complaints over decades and litigation over traffic stops. The officer stops you, requests a search. You decline. The officer says he will call for a canine unit. But you look around, and there's no canine unit visible anywhere. So you wait. And while you're waiting, another officer says, we're waiting for the canine unit. And you think, well, I knew that. And while you're waiting, you're upset because not too long ago, you read in the newspaper that the Supreme Court in the Rakugis case said such detentions were unconstitutional. That's pretty much it. Mr. McLeod, let me ask you. The district court said that during oral argument in her court, you said that you don't contend that the traffic stop was unreasonably prolonged in duration, only that it was prolonged for an improper purpose. But you've just said that you believe it was prolonged for 15 to 20 minutes to allow for a dog sniff, I think that I understood correctly. Well, more specifically, to allow dogs to come from afar to the vicinity to effectuate the dog sniff. I think the district court misconstrued what I said and made it into a concession when it was really a clarification. And at the hearing transcript, page 2719 to page 282, I said, and I'll quote the transcript, and just to clarify again, I am not stating a claim of overall unreasonably long stop, only that the stop was extended for improper purpose. Let me ask you about that, Mr. McLeod. If I understand what happened here, the initial officer who stopped you, talked to you for a while, and then he went off and it's two other officers who came by and told you they were waiting for a canine unit, correct? Is that what happened? The third officer who happened by, who also asked consent to search, I asked him. I understand that. I just want to make sure I have understood correctly that the officer who originally stopped you, Officer Stift, is now off the scene. That's correct. All right. Now, eventually he comes back on the scene and he has a summons for you or a... Yes. Okay. As I understand it, because your inspection sticker had expired, you could have either been given the summons or they could have impounded your car because you're not supposed to drive a car without a valid inspection sticker. Is that your understanding here? It's a theoretical possibility. There was no discussion about impoundments. Well, in your presence. Now, you don't know what was going on in the... It's about 15 minutes that the officer is away from you, right? Agreed, yes. Okay. So, to sustain your case, you're going to have to show that he had made the decision and was ready to issue the summons well before that 15 minutes had elapsed. Is that right? Because if he was on the phone with his sergeant, should I impound the car? Should I issue a summons? What should I do? That wouldn't have been improper under Rodriguez, correct? That's correct. That is speculation. No, I understand. You don't know what went on during that time. But in that sense, we're not dealing with a delay of, say, four hours where there might be more reason to think that, I mean, I picked something extreme. Absolutely. Where you would think that they had prolonged it. This one, it's possible they didn't prolong it because they weren't deciding what to do in your circumstance. That's a possibility, or at least the time is such that it doesn't preclude that. I think that in circumstances of the complaint, where it's a busy festival and actually impounding the car would have been impractical because it would have required a flatbed truck to come up a dirt road six miles. Mr. McClatchy, I don't want to get into what they could have done. But you understand that in Rodriguez, the Supreme Court's decision, there were facts that allowed for the conclusion that the stop had ended. Yes. And I'm just asking whether your facts allow us to conclude that the stop had ended and yet nevertheless they went ahead with the dog sniff. I think that what happened was that the officer concluded the questioning about the expired inspection sticker and then switched gears and started questioning about illegal drugs. And so after that point, there was never again a question about the car, the safety of the car, the inspection sticker, anything. Am I right? Go ahead. This is a motion to dismiss, right? Yes. So we don't know. We have had no discovery. We don't know. That is my point. Mr. McLeod, didn't you allege also that one of the officers who was questioning you about drugs and seeking your consent to search your vehicle while Mr. Stokes was at a distance said that they were waiting for the canine? That's correct. He did. That might suggest that there is some basis to believe that it wasn't to further complete the expired sticker, whatever was necessary to follow up on that. It might be. It could turn out either way. It might be. And again, this is a simple case. If the defendants have an alternative theory of the facts, they can... Do you have any sense of what the damages would be in a case like this? About a lost day's work, something like that? Why do you use the lost day's work as your measurement? I'm just curious. Because I didn't understand you to have lost a day of work. Did I miss something? Well, there was some emotional distress associated with this. I was... All right, well, that's a huge road. Okay. We're talking about... I'm thinking of how much it costs for the two of you to be transported from where... middle of Vermont, I suppose, Rutland is it, to New York and back. It strikes me as a fairly substantial... Well, Your Honor, the case isn't about the money. It's really about the principle here. Okay. And I would like to clarify the so-called admission. So it appears that the district court really misconstrued what I said. I was talking about claims, not interpretation of the fact. I'm sorry, what are you referring to? Well, both the district court and the defendants have brought out the fact that I conceded that the overall length of the stop was not unreasonable. It's not that... That's an interpretation of the fact. What I was getting to in the hearing was that my claim was not a general claim of an unreasonably long stop. My claim was much more specific that the stop was prolonged for the purpose of bringing drugs to the dogs in contravention of Rodriguez. So I didn't concede... Otherwise it would be a contradiction. I think we understand. Okay. So you've reserved two minutes for rebuttal. I'm going to go to Mr. Shaw. Thank you. May it please the Court. Waley Shaw for the defendants and police. The dog sniff in this case included five minutes before Officer Stokes concluded. The Supreme Court rejected the fact that just because they work efficiently and briefly, it's really whether the stop had ended. You heard the questions I asked of Mr. McCloud. Why isn't it appropriate to allow discovery at least on that point? Right, because discovery is only appropriate and overcoming qualified immunity is only appropriate if the complaint satisfies the standards of Iqbal and Twombly, and in this case it does not. But we can't expect Mr. McCloud to know whether in the 15 minutes that the defendant was away he was either finding out how to handle this traffic stop or just waiting for the dog. So until that's resolved, how do we know whether or not there's a plausible claim here? And that's not information within Mr. McCloud's possession. With all due respect, the fact that Mr. McCloud doesn't know what was happening, that in itself is not a way of overcoming the plausibility requirement. But he has two other officers who come and say to him that the reason he can't leave yet is that we're waiting for the dog, not you're going to get issued a summons, you have to wait for it. That's not what they tell him. Right, so let me jump straight to that statement. So there are various issues with that allegation, but most importantly, let's accept that that allegation is true and what that officer was saying is that we will not end this traffic stop unless or until the K-9 unit arrives and conducts a dog sniff. So I think that's a fair way of construing the allegation. That does not say that while they are waiting for the K-9 unit to arrive, Officer Stokes is not also at that same time doing what he needs to do to complete the stop. It simply says nothing. Officer Stokes can be waiting for the K-9 unit and doing the paperwork at the same time. Why hasn't he alleged enough under Rodriguez to get past a 12B6 motion? Well, because, for the exact reason that I said, because what he needs to allege is not just that they were waiting for the K-9 unit, because so long as Officer Stokes was acting lawfully during the wait, then there's no constitutional violation. But he's alleging that the stop was unnecessarily and unreasonably prolonged to pursue a drug investigation that was unrelated to the expiration of his sticker. And the district court seems to have relied on the sense that there was a concession during oral argument that there was no unreasonable prolongation. Mr. McCloud has clarified that that isn't what he intended to say and that he was misunderstood. I'm still having difficulty understanding why he hasn't satisfied 12B6. Right. So just to be clear, I mean, so we entirely understand Mr. McCloud to be making a claim that the time that it took to, that the stop was extended beyond the time it would otherwise have taken. And he does make a fair allegation to that effect in his complaint. But as we know from Iqbal and Twombly, the bare recitation of the elements of the constitutional violation here is not entitled to the presumption of truth. The question is whether there are sufficient... The Supreme Court thought that the alternatives were much more likely than the plaintiff's allegations. Here, I'm not sure we're in that situation. We just don't know. I mean, I posited to Mr. McCloud that 15 minutes might be a decision whether to impound his car or to issue him a summons. But if, you know, discovery shows that the officer, and I'm just speculating, went into the patrol car, called the K-9 unit, and it was only when the K-9s came back negatively that then they started to write the summons. That would be a very different scenario. And I'm perplexed as to why you don't think that should at least be developed. Well, it's certainly possible that Officer Stokes was simply sitting in his car and twiddling his thumbs, in which case, you know, we would concede that that is a constitutional violation. But the question is, is that nearly possible? Because if it's merely possible, that does not survive Iqbal and Twombly. Mr. McCloud has to... Is that plausible? No, I don't think it's plausible. And the reason it's not plausible is that we know from Iqbal where there's an allegation, a factual allegation, and it's consistent with lawful conduct, and that is the more obvious alternative explanation, then that... More obvious? Because I think the presumption is that a police officer, when conducting a traffic stop, is doing what he is supposed to be doing. So the question is that... There is reason to believe that maybe he wasn't. Well, I can't identify that basis in the... Difficult here is I can understand an officer, a perfectly honest officer, who doesn't know that he's supposed to know every Supreme Court decision that's ever been decided, would say, gee, I'm really concerned about this guy, and I'm really concerned about drugs, and I don't want to go in there, and he makes a judgment. Let's... I mean, it's plausible. That's truly plausible, isn't it? I think it's reasonable behavior. It's possible, but I don't think there's any... I think there's a presumption of regularity in the officer's conduct, and there's no... But also, I mean, it's alleged with some specificity that both Mr. Stokes and his colleagues continued to question Mr. McLeod about whether he had drugs and whether he'd consent to a search. And the context of the Rainbow Valley gathering also suggests that they may have had legitimate concerns, potentially, about drugs coming into the site or leaving the site. So why... That doesn't undermine... I mean, that gives some basis, potentially, for presuming that there might have been some other explanation for the delay. First, I would just point out that the officer's subjective motivation for conducting the stop is not relevant to the constitutional analysis under the Supreme Court's decision in Wren. But more importantly... It would be to the extent that he prolonged it beyond the purpose of the stop. My problem here is that you've got the plaintiff alleging, based on his direct knowledge, the two officers told him when he asked if he could leave that they were waiting for a canine dog. And it's hard for me to say that it's now implausible to think that that's the reason that the stop continued. After discovery, you may very well make a compelling case for qualified immunity. The question is whether you can make it on this record, where we have to construe the pleadings in the light most favorable to Mr. McLeod. That's entirely correct. But I just want to remind the Court that, again, this arises in a qualified immunity posture. The Supreme Court has said that qualified immunity should be addressed at the earliest possible stage. Absolutely, but on the accepting the facts as alleged by the plaintiff, you have to show the facts are inadequate. And I don't know how you can do that when he pleads the two officers tell him the reason he can't leave is because they're waiting for a canine dog. Well, it may be that they said that he can't leave until the canine unit completed the dog sniff. But, in fact, if, in fact, Officer Stokes was just doing what he was supposed to be... Ultimately, I think... There's no record on that. Right. I don't think we need a record. Ultimately, what this case comes down to is has Mr. McLeod adequately pleaded factual allegations in his complaint that make it plausible that what Officer Stokes was doing during the time that they were waiting for the dog sniff was simply sitting in his car and doing nothing and being dilatory? And I don't think... He doesn't have to allege or create the inference that Officer Stokes was doing nothing or being dilatory. He could have been busy with any number of things. But what he has alleged is that he was focused on drug sniffing and that the detention was prolonged as a result. Well, if Officer Stokes was sitting in his car and he was, you know, as Judge Rogers suggested, you know, asking his sergeant about whether to impound the car or he was just simply completing the paperwork or running a warrant search or any of those things, none of those would establish a constitutional violation. The violation... Proffer. I'm sorry? Do you want to give us a proffer? I'm sorry. I... I mean, the problem is you don't know. He's your client. You want to give us a proffer? Right. No. And, again, I don't think the court needs to know. The question is whether there was a plausible inference that what occurred was the only set of events that would create a violation. Thank you. Thank you very much. I think we have the argument. Mr. McCloud, you have two minutes to rebuttal. Thank you, Your Honor. Your Honor, as each of you have said, there is no way for me, myself, as a motorist or any motorist, to know what an officer is doing when he walks away to a squad car and he's on his radio, who he's talking to, who he's not talking to. It's a peculiar argument for us because we have the witness here. We have the witness here arguing as to plausibility. It puts it in a very slightly strange light for me, at least. Continue. I'm sorry. Your Honor, this case has been going on now for two and a half years, and the defendants have not provided any actual facts in this whole time. So the entire case so far has simply been attacking the theory of the complaint and raising all kinds of hypothetical reasons why it could not be so. Thank you. Thank you very much for your argument. We'll take the matter under advisement. The final case on our calendar this morning, United States v. Figueroa, is on submission. This court will please adjourn the court.